**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DIANA YATES,
*Defendant-Appellant.*

No. 18-30183

D.C. No.
3:15-cr-00238-
SI-2

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DAN HEINE,
*Defendant-Appellant.*

No. 18-30184

D.C. No.
3:15-cr-00238-
SI-1

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted December 10, 2020
Seattle, Washington

Filed October 8, 2021

Before:  Marsha S. Berzon, Eric D. Miller, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Miller;
Dissent by Judge Bress

## SUMMARY[*]

## Criminal Law

The panel vacated convictions and remanded for further proceedings in a case in which a jury found Dan Heine and Diana Yates, who were executives at the Bank of Oswego, guilty of one count of conspiracy to commit bank fraud (18 U.S.C. § 1349) and 12 counts of making a false bank entry (18 U.S.C. § 1005).

The government told the jury that Heine and Yates conspired to deprive the bank of three property interests: (1) accurate financial information in the bank's books and records, (2) the defendants' salaries and bonuses, and (3) the use of bank funds.  Explaining that there is no cognizable property interest in the ethereal right to accurate information, the panel held that the accurate-information theory—which was the cornerstone of the government's case and which the government conceded on appeal is invalid—is legally insufficient.  Emphasizing the distinction between a scheme whose object is to obtain a new or higher salary and a scheme whose object is to deceive an employer while continuing to

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

draw an existing salary, the panel held that the salary-maintenance theory was also legally insufficient. The panel held that even assuming the bank-funds theory was presented to the jury and was valid, the government's reliance on the accurate-information and salary-maintenance theories was not harmless in this case in which the jury returned a general verdict. The panel therefore vacated both defendants' convictions on the conspiracy count.

The panel held that because the conspiracy count is invalid, the defendants' convictions on the false-entry counts must be vacated as well, given that the district court instructed the jury that it could find the defendants guilty of making false entries as co-conspirators. The panel wrote that it would be inappropriate to consider harmless error sua sponte in this case, and that there is no basis for remanding to give the government an opportunity for a do-over after it made the strategic choice not to address all of the defendants' arguments in its appellate brief.

Heine and Yates argued that insufficient evidence supports their false-entry convictions on counts 7–9, 13, and 15, which charged that Heine and Yates omitted certain loans from the past-due loan balance on the Bank's quarterly FDIC call reports after arranging for third parties to make delinquent payments. The panel considered the sufficiency of the evidence on those counts because a finding of insufficient evidence would bar retrial. The panel reviewed the convictions on counts 7–9 de novo, Yates's convictions on counts 13 and 15 de novo, and Heine's convictions on counts 13 and 15 for plain error.

The panel concluded that insufficient evidence supports the convictions on counts 7–9 because the underlying loan

payments made by another bank customer were not themselves fictitious, so the entry at issue was not false.

The panel similarly concluded that insufficient evidence supports a finding of falsity on count 15, where a bank employee made the required payment using his own money. The panel held that the error was plain and affected Heine's substantial rights.

The panel held that the convictions on Count 13, which involved a loan to Chris Dudley, a former NBA player and Oregon gubernatorial candidate, are supported by sufficient evidence. To prevent his loan from being delinquent, Yates directed that a payment be made from Dudley's political campaign account without Dudley's knowledge and without his permission. The panel wrote that the payment was not what it was represented to be—an irrevocable commitment by the payor to depart with funds and allow the bank to keep the money in payment of an outstanding loan. Given that the transaction was performed on the final business day of the quarter, and Dudley's testimony that a right of setoff did not apply to the campaign account, the jury could have found that the transaction was concocted for the very purpose of distorting a financial statement, unauthorized, and subject to being reversed.

Dissenting, Judge Bress would have affirmed the convictions in full. He wrote that the majority contradicts governing precedents and improperly vacates convictions that were premised on a valid legal theory, backed by overwhelming proof of wrongdoing. He wrote that with no challenge to any jury instructions and no serious challenge to the admission of any evidence, this court exceeded its role by setting aside defendants' lawful conspiracy convictions. As to the false bank entry convictions, he wrote that in

holding that no rational jury could convict defendants of making false bank entries where the defendants were using bank money to cure "past due" loans, thereby masking the risk associated with the bank's loan practices, the majority departs from precedent while unduly limiting Congress's prohibition on false bank entries.

## COUNSEL

Elizabeth G. Daily (argued), Assistant Federal Public Defender; Stephen R. Sady, Chief Deputy Federal Public Defender; Portland, Oregon; Kendra M. Matthews, Boise Matthews Ewing LLP, Portland, Oregon; for Defendant-Appellant.

David M. Lieberman (argued), Attorney; Brian C. Rabbitt, Acting Assistant Attorney General; Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C.; Clarie M. Fay, Michelle H. Kerin, and Quinn P. Harrington, Assistant United States Attorneys; Amy E. Potter, Criminal Appellate Chief; Billy J. Williams, United States Attorney; United States Attorney's Office, Portland, Oregon; for Plaintiff-Appellee.

**OPINION**

MILLER, Circuit Judge:

Dan Heine and Diana Yates were executives at the Bank of Oswego in Lake Oswego, Oregon. After a 29-day trial, a jury found Heine and Yates guilty of one count of conspiracy to commit bank fraud and 12 counts of making a false bank entry. But as the district court explained at sentencing, unlike "your typical white-collar fraud case . . . neither defendant directly tried to line their pockets as a result of their fraud." Indeed, the novelty of some of the government's legal theories led the district court to predict that the case could result in "a really interesting appellate or Supreme Court decision."

We leave that judgment to the reader. On the issues we do need to decide, we agree with the defendants that two of the government's three theories of bank fraud were legally inadequate and that presenting those theories was not harmless. We therefore set aside the conspiracy conviction. Without a conspiracy, the false-entry counts cannot stand because the jury may have based its verdict on those counts on a theory of co-conspirator liability. We separately conclude that the evidence was insufficient to support the jury's guilty verdict on false-entry counts 7–9 and 15. We therefore vacate all of the convictions and remand for further proceedings.

I

Heine founded the Bank of Oswego in 2004. Over the next decade, he served as the bank's president and chief executive officer and as a member of the board of directors. Yates also joined the bank at its founding, serving as its executive vice president and chief financial officer until her

resignation in 2012. Over the years, Yates also served as the bank's chief operating officer and chief credit officer. Unlike Heine, Yates was not a member of the board. Both Heine and Yates served on the bank's internal loan committee, which met weekly to discuss the bank's outstanding loans and to decide whether to approve new loans. Particularly large loans required the approval of the board of directors.

As a new bank, the Bank of Oswego was closely scrutinized by the Federal Deposit Insurance Corporation. The FDIC requires banks to submit quarterly "call reports," public documents that include a bank's balance sheet, its income statement, and detailed information about its assets and liabilities. While the bank's controller was responsible for preparing the call reports, Yates had to approve the reports before they were submitted to the FDIC.

In January 2009, the bank hired a vice president of lending, Geoff Walsh. Walsh was a highly productive employee. In a 2011 performance review, Heine described him as a "rock star," adding that his "personality, contacts and intelligence" enabled the bank "to attract and serve many professionals of high net worth and influence in the Portland-metro area." At the same time, Heine noted "growing concern" with Walsh's "apparent breach of internal controls" and his failure to "follow[] sound lending policy, procedures and practices." Heine's concern would prove to be well-founded—Walsh's conduct set in motion the chain of events that would eventually lead to the defendants' convictions.

The bank's troubles began at the end of 2009 when the FDIC reported disappointing results after an on-site examination. Concluding that the bank's overall financial condition was "less than satisfactory," the FDIC identified "emerging weaknesses" in the bank's asset quality and loan

portfolio. The agency also criticized the bank's management structure, expressing particular concern over its concentration of responsibilities in Yates. The FDIC warned that "[a] single individual's ability to perform effectively in all of these roles is questionable" and that "[s]uch a concentration of responsibilities in one person . . . represents a weakness in the bank's internal control structure." In 2010, the bank entered into a memorandum of understanding with the FDIC to address the agency's concerns. But when the FDIC returned to examine the bank early in 2011, it again found the bank's condition "less than satisfactory," downgrading its management score and concluding that "CFO Diana Yates' split attention is contributing to risks."

In January 2012, an independent auditor discovered that Walsh had received personal loans from one of his clients, Martin Kehoe. Kehoe was a "hard money lender" who made non-bank loans to individuals at high interest rates. The auditor immediately forwarded her findings to Heine and Yates. Yates contacted Kehoe, who denied that Walsh had ever borrowed money from him. Heine was unconvinced. In his opinion, this was "a major issue" that had to be reported to the board. Yates responded that Heine was overreacting. Kehoe followed up with an email directly to Heine stating that Walsh had not received any loans through Kehoe's business and had never been paid a fee for any customer referrals.

Meanwhile, the FDIC continued to criticize the bank's performance. When the agency completed its 2012 examination, it informed Heine and Yates that it planned to downgrade the bank's management score yet again. According to Chris Shepanek, the chairman of the board of directors, Yates became "extremely upset about the whole situation," was overwhelmed by the bank's problems, and

felt that Heine failed to support her in meetings with the FDIC. She resigned shortly thereafter.

After Yates's departure, Heine began reviewing Walsh's emails, forwarding items that concerned him to the board. Eventually, Heine concluded that Walsh was involved in a hard-money lending scheme funded by a $1.7 million loan the bank had issued to Kehoe. Heine fired Walsh four days later.

In July 2013, Walsh was arrested and charged with offenses unrelated to his work at the bank; he eventually pleaded guilty to wire fraud and conspiracy to commit wire fraud. But he also pleaded guilty to one count of conspiracy to make a false bank entry in the course of his work at the bank. Walsh cooperated with the government and provided extensive testimony at Heine and Yates's trial.

In 2017, a grand jury returned a superseding indictment charging Heine and Yates with one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and 18 counts of making a false bank entry, in violation of 18 U.S.C. § 1005. The indictment alleged that Heine and Yates conspired "to conceal the true financial condition of the Bank and to create a better financial picture of the Bank [for] the Board of Directors, shareholders (current and prospective), regulators and the public" by "report[ing] false and misleading information about the performance of loans, conceal[ing] information about the status of foreclosed properties, ma[king] unauthorized transfers of Bank proceeds, and fail[ing] to disclose material facts about loans to Bank insiders to the Board of Directors, shareholders and regulators." The false-entry counts charged Heine and Yates with "conceal[ing] and omitt[ing] from Call Reports and Board of Directors' Reports material information about loans."

At trial, the government argued that the defendants—facing pressure from the FDIC and economic uncertainty due to the 2008 financial crisis—had conspired to defraud the bank. The government argued that Heine and Yates carried out the conspiracy through three schemes: (1) recruiting a bank employee named Daniel Williams to make an undisclosed straw purchase of a property located on A Avenue using bank funds; (2) arranging for third parties to make payments on delinquent customer loans to bring them current and then omitting those loans as delinquent on the bank's call reports; and (3) incorrectly accounting for two properties after selling them to a customer named Ronald Coleman and approving a loan to reconcile the error without disclosing that purpose to the internal loan committee.

The jury found the defendants guilty of the conspiracy count and 12 of the 18 false-entry counts. The district court sentenced Heine to 24 months of imprisonment and Yates to 18 months of imprisonment.

II

Count 1 of the indictment charged the defendants with violating 18 U.S.C. § 1349, which makes it a crime to "conspire[] to commit any offense under this chapter"—here, bank fraud. Bank fraud entails "knowingly execut[ing] . . . a scheme or artifice . . . to defraud a financial institution." *Id.* § 1344. A scheme to defraud "must be one to deceive the bank *and* deprive it of something of value," that is, money or property. *Shaw v. United States*, 137 S. Ct. 462, 469 (2016); *see id.* at 466; *see also Kelly v. United States*, 140 S. Ct. 1565, 1571–72 (2020); *Neder v. United States*, 527 U.S. 1, 20–21 (1999) (construing "scheme or artifice to defraud" identically for the mail, wire, and bank fraud statutes). And that property deprivation "must play

more than some bit part in a scheme"—the loss to the victim "must be an 'object of the fraud,'" not a mere "implementation cost[]" or "incidental byproduct of the scheme." *Kelly*, 140 S. Ct. at 1573–74 (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)).

The government told the jury that Heine and Yates conspired to deprive the bank of three property interests: (1) "accurate financial information in the bank's books and records," (2) "the defendants' salaries [and] bonuses," and (3) "the use of bank funds." Heine and Yates assert that the government also presented a fourth theory: that they sought to increase the value of their stock in the bank. They correctly point out that an increase in the value of stock that they owned could not be the object of bank fraud because it would not deprive the bank of any property interest. The government does not attempt to defend the stock-value theory but denies having presented one. Although the government said in closing argument that Heine and Yates "desired that their stock go up," that passing comment was offered merely as an explanation of the motive for some of the defendants' conduct, not as an independent theory of the object of the scheme. We therefore confine our analysis to the three theories that the government argued to the jury.

Reviewing de novo the district court's denial of Heine's and Yates's motions for judgment of acquittal, *United States v. Carey*, 929 F.3d 1092, 1096 (9th Cir. 2019), we hold that the government's accurate-information and salary-maintenance theories are legally insufficient, *see United States v. Barona*, 56 F.3d 1087, 1097–98 (9th Cir. 1995), and that presenting those theories to the jury was not harmless, *see Skilling v. United States*, 561 U.S. 358, 414 & n.46 (2010). We therefore vacate both defendants' convictions on count 1.

A

The accurate-information theory was the cornerstone of the government's case. The indictment alleged that "[o]ne of the purposes of the conspiracy"—and it specified only one—"was to conceal the true financial condition of the Bank and to create a better financial picture of the Bank" for the board and regulators. In pretrial proceedings, the government reiterated that "the primary purpose of the conspiracy . . . was to conceal the information."

That theory was also the first one the government advanced in closing argument. In discussing the "something of value" requirement, the government told the jury that the defendants "sought to deprive" the bank and the board of directors of "accurate financial information in the bank's books and records." Without that information, the government argued, the board could not properly "analyze the risks posed by the various borrowers who are late." To drive home the point, the government displayed a PowerPoint slide entitled "Something of Value," which asserted that the defendants "sought to deprive [the] Bank and [the board of directors] of accurate financial information . . . to make the Bank's books and records look better." The slide underscored that the information was valuable because the board "relies on the accuracy of financial records to perform its duties."

After the government's closing argument, Heine requested a curative instruction to the effect that "something of value cannot be the accuracy of the information that was the subject of the representation." The government opposed the instruction, saying, "We have always been clear that [accurate information] is something that we think is something of value." The district court declined to give the requested instruction or otherwise to instruct the jury on the

meaning of "something of value." In posttrial proceedings, the government continued to defend its position that "depriving the bank of information" is "something of value."

The accurate-information theory is legally insufficient. There is no cognizable property interest in "the ethereal right to accurate information." *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014). Although a property right in trade secrets or confidential business information can constitute "something of value," *Carpenter v. United States*, 484 U.S. 19, 26 (1987), "the right to make an informed business decision" and the "intangible right to make an informed lending decision" cannot, *United States v. Lewis*, 67 F.3d 225, 233 (9th Cir. 1995).

Recognizing accurate information as property would transform all deception into fraud. By definition, deception entails depriving the victim of accurate information about the subject of the deception. But "[i]ntent to deceive and intent to defraud are not synonymous." *United States v. Yermian*, 468 U.S. 63, 73 n.12 (1984) (quoting *United States v. Godwin*, 566 F.2d 975, 976 (5th Cir. 1978) (per curiam)). Rather, "the scheme must be one to deceive the bank *and* deprive it of something of value." *Shaw*, 137 S. Ct. at 469.

The government conceded at oral argument that it was no longer "defend[ing] that accurate information standing alone is a cognizable interest." Despite its repeated and direct statements before the district court that accurate information in itself constitutes "something of value," the government now argues that what it really meant was that the defendants' deception deprived the bank of its property rights in restructuring delinquent loans and pursuing debt collection. That was not the theory argued below, and we cannot uphold the verdict on appeal "on a different theory

than was ever presented to the jury." *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991).

For that reason, the government's reliance on *United States v. Ely*, 142 F.3d 1113 (9th Cir. 1997), is misplaced. There, we held that the right to collect a debt can constitute a cognizable property interest. *See id.* at 1119; *see also Pasquantino*, 544 U.S. at 356. But here, the government argued that Heine and Yates deprived the bank of its right to accurate information, not its right to collect borrowers' debts. The deprivation of that intangible right cannot support the convictions.

## B

The government also argued that Heine and Yates sought to deprive the bank of their salaries and bonuses. Although the indictment did not reference the theory, the government raised it early in pretrial proceedings, arguing "that the continuation of the benefits of employment . . . was a purpose of the conspiracy."

The government led with the theory in its opening statement at trial, inviting the jury to ask, "Why would Dan Heine and Diana Yates misrepresent the condition of the bank?" The government's answer: to receive their salaries and other financial compensation. The government reiterated the theory at closing argument, emphasizing that Heine and Yates "sought to ensure" their salaries and other financial compensation in light of their personal financial difficulties.

When Heine requested a curative instruction on the accurate-information theory after the government's closing argument, the government told the court that the defendants "desired for the financial condition of the bank to look better

than it was so that they could get their own salaries and compensation" because "they were in a dire cash situation." And in posttrial proceedings, the government again explained that "[w]ith respect to something of value," its "theory is the salary piece."

Of course, salaries and "other financial employment benefits" are both forms of "money." *United States v. Ratcliff*, 488 F.3d 639, 644 (5th Cir. 2007); *accord United States v. Del Valle*, 674 F.3d 696, 704 (7th Cir. 2012). If obtaining a new job or a higher salary is the object of a defendant's fraudulent scheme, then the deprivation of that salary can in some circumstances support a fraud conviction. *See, e.g.*, *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (new job and salary from fraudulent job application); *United States v. Doherty*, 867 F.2d 47, 55–56 (1st Cir. 1989) (Breyer, J.) (higher salary from a promotion obtained under false pretenses).

But there is a difference between a scheme whose object is to obtain a new or higher salary and a scheme whose object is to deceive an employer while continuing to draw an existing salary—essentially, avoiding being fired. The history of the Supreme Court's treatment of fraud in the employment context demonstrates why that distinction matters.

Before *McNally v. United States*, 483 U.S. 350 (1987), federal courts had treated the breach of a duty owed to one's employer as a form of fraud, reasoning that it operated to defraud the employer of the intangible right to the employee's honest services. *See, e.g.*, *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980); *United States v. Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942). But in *McNally*, the Court "stopped the development of the intangible-rights doctrine in its tracks,"

construing the federal fraud statutes "as limited in scope to the protection of property rights." *Skilling*, 561 U.S. at 401–02 (quoting *McNally*, 483 U.S. at 360). Dissenting alone on this point, Justice Stevens argued that the Court's distinction made no sense because every time a person is "paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for." *McNally*, 483 U.S. at 377 n.10 (Stevens, J., dissenting).

The year after *McNally*, Congress enacted 18 U.S.C. § 1346, which criminalizes any "scheme or artifice to deprive another of the intangible right of honest services." Read broadly, that statute would be too vague to satisfy the Due Process Clause. *See Skilling*, 561 U.S. at 408–09. So to avoid declaring the statute unconstitutional, the Court has construed it to proscribe only the "core" of the pre-*McNally* intangible-rights doctrine: "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Skilling*, 561 U.S. at 404. The Court has expressly rejected the suggestion that section 1346 covers "undisclosed self-dealing by a public official or private employee—*i.e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 409–10.

In *Skilling*, for example, the government's theory was that Skilling had "conspir[ed] to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price," and that he had "profited from the fraudulent scheme . . . through the receipt of salary and bonuses, . . . and through the sale of approximately $200 million in Enron stock." 561 U.S. at 413

(ellipses in original). But because there was no allegation "that Skilling solicited or accepted side payments from a third party in exchange for making these misrepresentations," the Court thought it "clear" that he had not committed honest-services fraud. *Id.*

*Skilling*'s rejection of the salary-maintenance theory is persuasive here. To be sure, the government charged Heine and Yates with conspiring to commit property fraud, not honest-services fraud. But we do not believe the Court intended "to let in through the back door the very prosecution theory that [it] tossed out the front." *United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988). Permitting the government to recharacterize schemes to defraud an employer of one's honest services—thereby profiting "through the receipt of salary and bonuses," *Skilling*, 561 U.S. at 413—as schemes to deprive the employer of a property interest in the employee's continued receipt of a salary would work an impermissible "end-run" around the Court's holding in *Skilling*. *Kelly*, 140 S. Ct. at 1574.

It also would criminalize a wide range of commonplace conduct. *See McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016) (noting a due-process concern with the prospect of "prosecution, without fair notice, for the most prosaic interactions"). Consider an employee who wastes time on the Internet but then, to avoid being fired, falsely claims to have been working productively. Presented with that scenario at oral argument, the government declined to say whether the employee would be guilty of federal fraud on a salary-maintenance theory. The government's hesitation is understandable. Extending the fraud statutes in that way would raise serious concerns about whether the offense is defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited and . . . in a

manner that does not encourage arbitrary and discriminatory enforcement." *Skilling*, 561 U.S. at 402–03 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

We are not convinced that what Heine and Yates did is meaningfully different—at least as it relates to their salaries and bonuses—from the behavior of the Internet-surfing employee. The government insists that the "defendants' scheme went beyond an intent to maintain their salaries" because "[t]he board of directors used a performance-based system" of compensation; by making the bank's performance appear better than it actually was, Heine and Yates obtained increased compensation. We agree that if an employer offers a raise or a bonus tied to some specific performance metric, an employee who lies about having achieved that metric has deprived the employer of something of value. But the evidence at trial showed that the defendants were interested in receiving standard annual raises and end-of-year bonuses that were based on the bank's overall financial condition, not on any specific metric they falsified to obtain additional compensation. In practice, that seems little different from deceiving an employer about working productively. In any event, the government's argument to the jury did not distinguish between the maintenance of the defendants' existing salaries and the receipt of an increased salary or bonus. As the government presented the case, it was effectively an honest-services case dressed in the garb of salary deprivation.

## C

The government's remaining theory was that—as the government put it in its closing argument—Heine and Yates "misled the bank and the board of directors for the use of bank funds to continue their conspiracy." The jury could have understood that statement to refer to the accurate-

information theory we have held not to be viable. And the government said little more about the theory at trial. Although it presented extensive evidence of the defendants' misuse of bank funds, the phrase we have just quoted was its only plausible reference to the possibility that depriving the bank of funds might have been the object of the conspiracy.

Assuming it was such a reference and not merely a repeat of the accurate-information theory, we agree with the government that a bank has a property interest in its funds and that it "has the right to use [its] funds as a source of loans that help the bank earn profits." *Shaw*, 137 S. Ct. at 466. In addition, a bank's right to its funds extends to the "right to decide how to use" those funds. *Carpenter*, 484 U.S. at 26. So the fraudulent diversion of a bank's funds for unauthorized purposes certainly could be the basis for a conviction under section 1344.

Although the bank fraud statute "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss," *Shaw*, 137 S. Ct. at 467, it does demand that the use of bank funds be an object of the scheme, *Kelly*, 140 S. Ct. at 1573–74. Heine and Yates emphasize that the government argued below that the object of the fraud was "to give the false appearance that The Bank of Oswego was performing better than it was," so that Heine and Yates could maintain their salaries and bonuses at a time when they faced personal financial difficulties. Relying on the Supreme Court's decision in *Kelly*, they insist that any effect on bank funds was merely an "incidental byproduct" of their scheme. *Id.* at 1573. And because the trial took place before *Kelly* was decided, the jury instructions did not reflect *Kelly*'s elaboration of the requirement that money or property be the object of the scheme.

We need not consider whether or how *Kelly* might affect this case. Instead, even assuming that the bank-funds theory was presented to the jury and was valid, we still must overturn the conspiracy conviction because the government's reliance on the accurate-information and salary-maintenance theories was not harmless. As we have explained—and as the government concedes with respect to the accurate-information theory—both theories were legally invalid. The Supreme Court has held that "constitutional error occurs" when a jury "returns a general verdict that may rest on a legally invalid theory." *Skilling*, 561 U.S. at 414; *see Yates v. United States*, 354 U.S. 298 (1957); *United States v. Garrido*, 713 F.3d 985, 994 (9th Cir. 2013); *Barona*, 56 F.3d at 1097–98. To determine that a constitutional error was harmless, we "'must be able to declare a belief that it was harmless beyond a reasonable doubt,' in that it 'did not contribute to the verdict obtained.'" *United States v. Holiday*, 998 F.3d 888, 894 (9th Cir. 2021) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

That standard is not satisfied here. As we have already recounted at length, the accurate-information and salary-maintenance theories did not make up just a few stray lines on a PowerPoint slide at closing argument; they were the focus of the entire prosecution from beginning to end. The indictment charged the object of the conspiracy only as "conceal[ing] the true financial condition of the Bank." Although the defendants were alleged to have made "unauthorized transfers of Bank proceeds," they did so, according to the indictment, "[t]o achieve" their goal of depriving the bank of accurate information regarding its financial condition. The government repeatedly defended the accurate-information and salary-maintenance theories before the district court. In its closing argument, the government's explanation of "the reason why the

defendant[s] sought to deceive the bank" devoted all but half of a sentence to those theories. By contrast, the government referenced the bank-funds theory only once, commenting that "throughout the course of the conspiracy," Heine and Yates "misled the bank and the board of directors for the use of bank funds to continue their conspiracy"—itself a statement that could be interpreted, consistent with the indictment, as arguing that the defendants used bank funds only to further their accurate-information and salary-maintenance objectives. And the jury instructions, although correct so far as they went, did nothing to define "something of value" to preclude conviction under the government's invalid theories, despite the defendants' request for an instruction on that issue. In sum, the entire district court proceedings "were permeated with the prohibited . . . theor[ies]." *Garrido*, 713 F.3d at 998; *see also id.* at 996–98 (evaluating the harmlessness of an invalid legal theory by examining the indictment, jury instructions, and closing arguments).

And the evidence of guilt was hardly so overwhelming as to ensure that the jury could not have found in favor of the defendants in the absence of the errors. *See United States v. Perez*, 962 F.3d 420, 442 (9th Cir. 2020). To the contrary, the evidence would have permitted the jury to find that Heine and Yates's scheme aimed to deprive the bank not of its funds, but instead—just as the government argued throughout the case—of their salaries and of accurate information about the bank's financial condition. Significantly, the jury returned a split verdict and deliberated for four days—facts that weigh against a finding of harmless error. *United States v. Obagi*, 965 F.3d 993, 998 (9th Cir. 2020); *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc). Thus, we are unable to say

beyond a reasonable doubt that the invalid legal theories did not contribute to the jury's verdict.

Bank executives considering engaging in fraud should take no comfort from this result. Our decision in no way limits the scope of sections 1344 and 1349 or the government's ability to bring prosecutions under those statutes. We hold only that when the government devotes the bulk of its presentation to two legally invalid theories of guilt—the most prominent of which, it bears repeating, the government now admits was invalid—we will not affirm a general verdict simply because, had we been on the jury, we might have found the defendants guilty on a third theory.

## III

Heine and Yates argue that because the conspiracy count is invalid, their convictions on the false-entry counts must be vacated as well. We agree.

The district court instructed the jury that it could find the defendants guilty of making false entries as principals, as aiders and abettors, or as co-conspirators. Specifically, the court instructed that "[e]ach member of a conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy," as long as those actions "fell within the scope of the unlawful conspiracy or agreement and could reasonably have been foreseen." Under *Pinkerton v. United States*, 328 U.S. 640 (1946), that instruction correctly stated the law. But *Pinkerton* liability depends on the existence of a cognizable conspiracy; without a valid conspiracy count, the *Pinkerton* theory cannot be a basis for the other convictions. Emphasizing that point, Heine and Yates argued in the body of their opening brief that the invalidity of the conspiracy conviction "requires reversal of the false

bank entry counts because . . . the convictions may have been based on the jury's conclusion that each count was a reasonably foreseeable consequence of the (invalid) conspiracy count," rather than on a conclusion that Heine and Yates had any personal involvement in the false-entry offenses.

If the evidence at trial made it clear "beyond a reasonable doubt that the jury in this case would have convicted . . . based on principal or aider-and-abettor liability," then the *Pinkerton* instruction would have been harmless. *United States v. Manarite*, 44 F.3d 1407, 1414 n.9 (9th Cir. 1995); *see United States v. Castaneda*, 16 F.3d 1504, 1511–12 (9th Cir. 1994). But despite the defendants' express challenge to the *Pinkerton* instruction as applied in the absence of a valid conspiracy conviction, the government did not argue in its brief before us that the instruction so applied was harmless. The government did not overlook the point because the defendants' argument was somehow hidden; the defendants stated that they were appealing their convictions "for one count of conspiracy to commit bank fraud . . . and 12 counts of making false bank entries," and they presented their argument in a section of their brief entitled, "[t]he district court's error in permitting the government to pursue invalid theories of guilt requires reversal on *all* counts." (emphasis added; capitalization omitted).

As a general rule, we decide only the issues presented to us by the parties. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). That rule reflects our limited role as neutral arbiters of legal contentions presented to us, and it avoids the potential for prejudice to parties who might otherwise find themselves losing a case on the basis of an argument to which they had no chance to respond. *See id.* Harmless error is no exception to that general rule. *See*

*United States v. Rodriguez*, 880 F.3d 1151, 1163 (9th Cir. 2018). Accordingly, we have held that a claim of harmless error is subject to forfeiture, and that we will not consider it when, as in this case, the government does not "advance a developed theory about how the errors were harmless." *Id.* (quoting *United States v. Murguia-Rodriguez*, 815 F.3d 566, 572–73 (9th Cir. 2016)).

Although we have discretion to consider harmless error sua sponte, it would be inappropriate to do so here. In deciding whether to consider a forfeited argument of harmless error, we consider "the length and complexity of the record," "whether the harmlessness of an error is certain or debatable," and "the futility and costliness of reversal and further litigation." *Rodriguez*, 880 F.3d at 1164 (quoting *United States v. Brooks*, 772 F.3d 1161, 1171 (9th Cir. 2014)). Here, the record is long and complex, the product of a trial that featured 43 witnesses and 584 exhibits. Perhaps a review of the record would reveal that the *Pinkerton* instruction was indeed harmless with respect to some of the counts even though the conspiracy conviction cannot stand, but the answer is hardly certain: While Heine and Yates were personally involved in making the reports charged as false entries, they disputed the extent to which they understood the true facts, were duped by Walsh, or actually made any misstatement in response to the specific questions asked. It would be unfair to Heine and Yates to resolve those disputes on the basis of a theory that was not advanced by the government and that they have not had an opportunity to address. Nor is there any basis for remanding to give the government an opportunity for a do-over after it made the strategic choice not to address all of the defendants' arguments in its appellate brief.

IV

Heine and Yates argue that insufficient evidence supports their false-entry convictions on counts 7–9, 13, and 15. Although we have already vacated all of the convictions, we still must consider the sufficiency of the evidence on these counts. A finding of insufficient evidence, unlike a determination that the *Pinkerton* instruction could have been erroneously applied in light of the invalidity of the conspiracy conviction, would bar retrial. *See United States v. Gergen*, 172 F.3d 719, 724–25 (9th Cir. 1999); *United States v. Bibbero*, 749 F.2d 581, 585–86 (9th Cir. 1984).

Both defendants preserved their challenges to counts 7–9, so we review those convictions de novo. The government argues that our review on counts 13 and 15 is for plain error only. It is correct as to Heine. Although Heine moved for a judgment of acquittal at the conclusion of the government's case on the ground that insufficient evidence supported his false-entry charges, he "failed to renew [his] motion[] for judgment of acquittal at the close of all the evidence" on this point. *United States v. Winslow*, 962 F.2d 845, 850 (9th Cir. 1992). Yates, however, renewed her challenge to the sufficiency of the evidence on all counts in her motion for judgment of acquittal after the close of evidence. Accordingly, our review of Yates's convictions on counts 13 and 15 is de novo. *See United States v. Boykin*, 785 F.3d 1352, 1359 (9th Cir. 2015).

We may reverse a conviction for insufficient evidence only if, viewing the evidence in the light most favorable to the government, no rational trier of fact could "find the essential elements of the crime beyond a reasonable doubt." *United States v. Stoddard*, 150 F.3d 1140, 1144 (9th Cir. 1998). As relevant here, the elements of the offense under section 1005 are (1) making a false entry in bank records or

causing a false entry to be made, (2) knowing the entry was false at the time it was made, and (3) intending that the entry injure or deceive a bank or public official. *United States v. Wolf*, 820 F.2d 1499, 1504 (9th Cir. 1987). The only challenge here is to the first element.

A

An entry is false if it "represent[s] what is not true or does not exist." *United States v. Darby*, 289 U.S. 224, 226 (1933) (quoting *Agnew v. United States*, 165 U.S. 36, 52 (1897)). Conversely, the offense of false entry "is not committed where the transaction entered actually took place, and is entered exactly as it occurred." *Coffin v. United States*, 156 U.S. 432, 463 (1895). That is so "even though it is a part of a fraudulent or otherwise illegal scheme." *United States v. Erickson*, 601 F.2d 296, 302 (7th Cir. 1979); *accord United States v. Hardin*, 841 F.2d 694, 699–700 (6th Cir. 1988); *United States v. Manderson*, 511 F.2d 179, 181 (5th Cir. 1975).

*Coffin*'s rule is subject to two important qualifications. First, an entry is false, for purposes of section 1005, if it omits material information or "vital fact[s]" requested by a bank or regulator, even if the entry, on its face, is literally true. *Ely*, 142 F.3d at 1119. For example, a loan application that "d[oes] not reflect either the true borrower or the actual purpose" of a loan omits material information and is therefore false for purposes of section 1005. *Wolf*, 820 F.2d at 1504. Thus, we held that the indictment in *Ely* stated an offense because it alleged that the defendants gave only a partial answer that omitted key facts when asked for the purpose of the loan they sought; they said that they sought a loan to obtain an "injection of capital to enable expansion of business enterprises," while their real reason was to be able

to make payments on their existing debts. *Ely*, 142 F.3d at 1119.

Second, an entry is false if it records a transaction that is itself "false and fictitious, concocted for the very purpose of distorting [a] financial statement"—as opposed to a transaction that is merely a part of some broader fraudulent or illegal scheme. *United States v. Gleason*, 616 F.2d 2, 29 (2d Cir. 1979); *accord Erickson*, 601 F.2d at 302. In *Darby*, for example, the Supreme Court held that a bank entry that recorded a promissory note bearing a signature known to be forged was false because "[n]o note with such a signature had been discounted by the bank." 289 U.S. at 226. As Justice Cardozo colorfully put it, "Verity was not imparted to the entry by the simulacrum of a signature known to be spurious." *Id*. The entry was just as false as if "dollars known to be counterfeit . . . ha[d] been entered in the books as cash," and it meant that "upon an inspection of [the] bank, public officers and others would [not] discover in its books of account a picture of its true condition." *Id.*

Applying that reasoning, we held in *Hargreaves v. United States*, 75 F.2d 68 (9th Cir. 1935), that a bank executive caused a false entry to be made when he directed an uncompensated strawman to obtain a loan from the bank without disclosing that the loan was for the executive's private benefit. *See id.* at 70, 72. The entry was false because the transaction it memorialized—involving a strawman who likely would not have qualified for the loan, never intended to repay it, and immediately gave the proceeds to the defendant—was itself fictitious. *See id.*; *see also United States v. Krepps*, 605 F.2d 101, 109 (3d Cir. 1979).

B

Counts 7–9, 13, and 15 charge that Heine and Yates omitted certain loans from the bank's past-due loan balance on its quarterly call reports after arranging for third parties to make the delinquent payments. Heine and Yates argue that they were correct not to report the loans as past due—and thus that the call reports were not false—because the bank had received real payments on the loans. In their view, it is irrelevant whether a third party or the borrower made the payment.

The pertinent schedule to the FDIC's call reports asks for three pieces of information: a bank's aggregate total of loans past due for 30–89 days, the aggregate total of loans past due for 90 days or more, and the aggregate total of non-accruing—that is, delinquent—loans. In other words, it asks for three numbers. The form does not call for a narrative response, allow for comment, request a breakdown of the particular loans that are past due, or ask for the source of a payment on any of the underlying loans. The FDIC's detailed instructions for completing the schedule require a loan "to be reported as past due when the borrower is in arrears two or more monthly payments."

The government's FDIC witness, Assistant Regional Director Paul Worthing, confirmed at trial that the FDIC's instructions do not require a bank to disclose the source of a payment on a loan or state that a loan remains past due if it is paid by someone other than the borrower. Worthing also conceded that there is no rule or regulation that would prevent a third party—including a bank employee—from making a loan payment on a customer account as a gift. He testified only that the FDIC would find such transactions "problematic" or "improper."

1

Counts 7–9 relate to loans to three bank customers: Howard Abrams, Edward Duffy, and Robert Goodman. The loans would have been delinquent, but Kehoe, another bank customer, made the required payments. We conclude that insufficient evidence supports the convictions on those counts.

The government emphasizes that Kehoe made the payments using the proceeds of a loan that he himself had obtained from the bank. But unlike the loans in *Hargreaves* and *Krepps*, the loan to Kehoe was a real loan that was approved by the board of directors, not a fictitious loan disbursed for the defendants' pecuniary gain. The loan application disclosed that some of the proceeds would be used for "hard money loans for non-consumer needs." And the board was aware that Kehoe loaned money to bank customers, including Abrams, before it approved the loan.

Once the loan was issued to Kehoe, the money was Kehoe's to use as he wished. He could invest it, spend it on himself, or use it to make payments on other bank customers' loans. It is irrelevant that the customers were unaware of the payments (or, in the case of Duffy, apparently opposed to them)—the bank was entitled to payment, and the customers had no right to refuse to make timely payments on valid loans. When Kehoe made the payments, the bank received real money, and the loans were no longer delinquent. It was not false to report them as current. Nor is there evidence that the loan Kehoe used to make the payments was in arrears. So reporting the loans on which he made payments as up to date did not conceal a net arrearage in the funds lent by the bank.

The government insists that "a 'past due' loan means a loan where the borrower had stopped making payment," suggesting that a loan might still be past due if someone else made the payment. That view is contradicted by Worthing's testimony, which confirms that if a loan is current, no rule requires it to be reported as past due simply because the payment came from a third party. Indeed, the government conceded at oral argument that, had the payment come from a borrower's grandmother, the entry would not have been false. Kehoe may not have been anyone's grandmother, but the schedule did not ask whether the payment had been made by the borrower, by the borrower's grandmother, or by a hard-money lender; it asked only whether the payment had been made. It had. It may be that the FDIC would benefit from knowing whether a borrower was personally responsible for making a loan payment so that it can better evaluate the soundness of a bank's lending practices. If so, the agency can revise its call report instructions to ask for that information. The agency could also ask, although the schedule at issue here did not, whether the payment was made from the proceeds of another loan made by the bank— but even on the current schedule, any arrearage in *that* loan would have had to be included in the report.

In this and in many of the other transactions at issue, Heine and Yates displayed an economy with the truth that is not much to their credit. But in the absence of any requirement to disclose the omitted information, what is true of perjury is true here as well: "[W]hen a statement is literally true, it is, by definition, not false and cannot be treated as such . . . , no matter what the defendant's subjective state of mind might have been." *United States v. Aquino*, 794 F.3d 1033, 1036 (9th Cir. 2015) (first alteration in original) (quoting *United States v. Castro*, 704 F.3d 125, 139 (3d Cir. 2013)). Even if a transaction "is a part of a

fraudulent or otherwise illegal scheme," it is not false to report it as it occurred. *Erickson*, 601 F.2d at 302.

Perhaps the government could have charged that Kehoe's loan application was false for omitting material information about how he intended to use the money once he received it. *See Ely*, 142 F.3d at 1119. But that is not what it charged. It charged only that the aggregate total of past due loans on the call report was false for omitting the Abrams, Duffy, and Goodman loans from the total. Because the underlying loan payments made by Kehoe were not themselves fictitious, that entry was not false.

2

Similarly, insufficient evidence supports a finding of falsity on count 15, which involved a loan to another bank customer, Chris Guettler, for which Walsh made a payment using his own money. As Worthing testified, no FDIC rule or regulation prohibited Walsh's conduct. That Yates instructed the bank's controller to change the transaction's description to say "[s]omething more generic" is evidence of her intent to deceive concerning the nature of the transaction, but it has no bearing on whether the call report itself, requiring only a report of the aggregate amount of past due loans, was false. Because the required payment had been made, the call report correctly omitted Guettler's loan balance from the bank's aggregate total of past due loans, and it was not false. We also conclude that, in light of the instructions for completing the call report and Worthing's testimony, the insufficiency on count 15 is plain, and the error affected Heine's substantial rights. *See United States v. Olano*, 507 U.S. 725, 732 (1993).

3

Count 13 is different. That count involved a loan to Chris Dudley, a former NBA player and Oregon gubernatorial candidate. To prevent his loan from being delinquent, Yates directed that a payment be made without Dudley's knowledge from his political campaign account, called the "Friends of Chris Dudley" account. Dudley did not give permission for the bank to take funds out of his campaign account to make the payment.

We agree with the Seventh Circuit that "entries recording unauthorized transactions involving the [bank] accounts of customers without the knowledge or consent of the customer or the institution" are false because the underlying transactions are fictitious. *United States v. Marquardt*, 786 F.2d 771, 779 (7th Cir. 1986). Yates did not just make a payment on Dudley's loan without his knowledge or approval, as Kehoe did for Abrams, Duffy, and Goodman. That would not have been sufficient to show falsity. Instead, Yates caused money to be taken out of the Friends of Chris Dudley account without Dudley's knowledge or approval to be used for an unauthorized purpose. The transaction was a sham; once Dudley found out about it, he could have demanded that it be reversed and that the money be returned to him. So reporting that money as a payment on Dudley's loan when the money should have remained in Dudley's account and could have been recovered from the loan account was not truthful. The payment was not what it was necessarily represented to be—an irrevocable commitment by the payor to depart with funds and allow the bank to keep the money in payment of an outstanding loan. And given that the transaction was performed on the final business day of the quarter, the jury could have found that it was "concocted

for the very purpose of distorting [a] financial statement"—that quarter's call report. *Gleason*, 616 F.2d at 29.

At trial, Heine and Yates emphasized that the promissory note for Dudley's loan included a right of setoff "[t]o the extent permitted by applicable law" in all of Dudley's accounts with the bank, meaning that the bank had authorization to take funds from those accounts to pay his loan balances. But Dudley testified that the right of setoff applied only to his personal accounts and did not extend to the "Friends of Chris Dudley" account. As no bank records showed otherwise, the jury could have believed Dudley's testimony and concluded that the transaction was indeed unauthorized and therefore subject to being reversed.

\*   \*   \*

Heine and Yates challenge various evidentiary rulings and assert that the district court erred in calculating the bank's losses for sentencing purposes. Having vacated all of the convictions, we do not consider those arguments.

**VACATED and REMANDED.**

BRESS, Circuit Judge, dissenting:

The defendants in this case, two bank executives, fraudulently transferred money from their bank and then surreptitiously re-routed it back in to disguise the bank's faltering finances. In doing so, they failed to disclose to the bank's Board and the FDIC the nature of their transactions. The defendants' conduct was not merely unsavory—it was plainly unlawful.

Yet despite a nearly month-long jury trial involving dozens of witnesses, the majority vacates defendants' convictions for conspiracy to commit bank fraud, 18 U.S.C. § 1349, and making false bank entries, 18 U.S.C. § 1005. In my view, the majority errs. A proper understanding of the facts of this case and the mechanics of defendants' scheme confirms the verdict of the jurors who heard the evidence of defendants' misdeeds firsthand. Instead, the majority contradicts governing precedents and improperly vacates convictions that were premised on a valid legal theory, backed by overwhelming proof of wrongdoing. With no challenge to any of the jury instructions and no serious challenge to the admission of any evidence, we have exceeded our role by setting aside defendants' lawful conspiracy convictions.

The majority's decision to vacate defendants' false bank entry convictions is perhaps of even greater concern to me. The defendants did not include in FDIC reports as "past due" certain loans in which payments were made on behalf of the borrowers. The problem was that the money used to pay most of these loans had come from the bank itself—money defendants fraudulently loaned out to a trusted "hard money lender" who then paid the delinquent loans of the otherwise "past due" borrowers, without these borrowers even knowing. The defendants were using bank money to cure "past due" loans, thereby masking the risk associated with the bank's loan practices. In holding that no rational jury could convict defendants of making false bank entries under these circumstances, the majority opinion again departs from precedent while unduly limiting Congress's prohibition on false bank entries.

Much of our nation's powerful economy owes itself to the integrity of its banks. Banking executives have positions

of unique trust and responsibility, particularly in their local communities, as the defendants here did. The majority opinion will, I fear, destabilize the public confidence on which our country's banking system depends and hobble the principal federal laws designed to protect it. I respectfully dissent.

## I

Dan Heine and Diana Yates had serious problems. The Bank of Oswego—where Heine was CEO and a member of the Board of Directors and Yates served as Executive Vice President and Chief Financial Officer—was under close scrutiny from the Federal Deposit Insurance Corporation (FDIC). A 2009 FDIC examination concluded that the "overall condition of the bank," laden with underperforming loans, was "less than satisfactory." "Asset quality ha[d] deteriorated," "[e]arnings performance [was] weak," and there was "[i]nsufficient segregation of job responsibilities at the senior management level," which contributed to "the increased risk profile of the institution." In July 2010, the FDIC required defendants to sign a memorandum of understanding ("MOU") on behalf of the bank, in which they promised to reduce problematic assets, improve oversight of lending and reporting practices, and increase reserve capital.

In the meantime, Heine and Yates were dealing with personal financial troubles of their own. Just before signing the MOU, Heine was experiencing a "[s]erious cash flow problem" and was borrowing heavily on his personal line of credit at the bank. The following year, Heine was still experiencing "cash flow pressure," but, he told Yates, "[i]f the bank does not fail, I should be fine in the end."

Yates was in a similarly perilous situation. The government's evidence showed she had substantial credit

card debt, her checking account was routinely overdrawn, and she was also borrowing from the bank to pay other bills. Heine and Yates needed their bank to stay afloat, so that they could stay afloat themselves.

The confluence of the bank's tenuous position before federal regulators and Heine and Yates's own precarious finances set the stage for defendants' elaborate efforts to camouflage the bank's financial picture.  One of the most striking features of the majority opinion, however, is what it leaves out.  The majority's recitation of the government's case is at best a high-level summary that omits nearly all the evidence of bank fraud presented in defendants' month-long trial, which featured dozens of witnesses and hundreds of exhibits.  In reviewing the jury's verdict, "we are obliged to construe the evidence in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010) (quotations omitted).  From the majority opinion, one would have little idea what this evidence even is.

The government's case centered on three interrelated schemes.  In each, defendants' *modus operandi* was roughly the same.  Collaborating with Geoff Walsh—the bank's Vice President of Lending who later pleaded guilty and was a star government witness—defendants would divert bank funds, either by withdrawing the funds themselves or by fraudulently sponsoring loans to third parties.  Defendants would then direct those funds through third parties and back to the bank, using the returned money to wipe away troubling features of the bank's portfolio.  In so doing, defendants made the bank's financial picture appear better than it really was.

I now lay out the key facts here in some detail because it is important to understand defendants' scheme to appreciate

why I believe the majority errs in vacating defendants' convictions.

A

The first scheme was a series of sham transactions related to a Lake Oswego property called "A Avenue," on which the bank held a second mortgage. When the borrower defaulted, the priority creditor foreclosed and sold A Avenue to Fannie Mae in October 2010. As a non-priority creditor, the bank had no recourse and no ownership interest in A Avenue—meaning it would have to take a total loss on the loan which would need to be disclosed to the FDIC. Defendants were "very concerned" about this, so they developed a highly unorthodox plan.

Heine, Yates, and Walsh approached Danny Williams, a junior credit analyst at the bank with a $30,000 annual salary, and asked Williams if he would purchase A Avenue from Fannie Mae "on behalf of the bank." Fannie Mae required that any prospective purchaser intend to live in the home, which meant that the bank could not simply purchase the property outright. To get around this, defendants prevailed on Williams to serve as a straw purchaser. Williams testified that the three executives explained to him that the bank would fund Williams's purchase of A Avenue. If Fannie Mae discovered that Williams was a straw buyer, the bank would cover any penalties. Williams agreed to participate to "be the team player they wanted me to be."

Yates signed a letter in which she falsely attested to Fannie Mae that Williams had sufficient funds to purchase the home. Yates also drew from bank funds a cashier's check for $26,500, which Williams used to make a down payment on A Avenue. A few days later, Yates drew a second cashier's check in the amount of $241,227—again,

using bank funds—for Williams to complete the purchase. The jury saw both checks, bearing Yates's signature. Williams signed the contract for A Avenue, and, on February 8, 2011, he obtained sole ownership of the property.

After Williams had completed the purchase, Heine, Yates, and Walsh went out to lunch and celebrated (apparently Williams, who took one for the team, was not invited). Heine emailed Yates that they "may have dodged some bullets" by pulling off the A Avenue plan because they would now likely "have [it] off the books by the end of May." Heine also conveyed to the Board, falsely, that the bank had gained title to the property. Bank board member Chris Shepanek testified that the Board was not informed about Williams's role in the transaction. Shepanek further testified that a loan to a bank employee to buy a foreclosed property "would be suspicious to me" and would have required Board approval.

The bank was required to submit quarterly "call reports" to the FDIC disclosing certain financial information. Heine and Yates were responsible for signing off on the bank's call reports every quarter. One item on the call reports was the bank's "Other Real Estate Owned" or OREO, which is comprised of properties a bank acquires from borrowers after foreclosure. Because OREO properties are acquired after a borrower defaults on a loan, the loans on these properties did not generate revenue. But having an OREO property was better than having no property at all because at least then the bank owned something.

Once Williams used bank funds to buy A Avenue, defendants on the next call report falsely listed A Avenue as an OREO property that belonged to the bank, even though it belonged to Williams. Williams never intended to live at A Avenue; although he had certified to Fannie Mae that he

would reside there, he told the jury this was a "false statement." In May 2011, at the direction of Walsh, Williams transferred A Avenue to the bank for no money via quitclaim deed, and the bank quickly sold the property.

B

Defendants were also required to include on FDIC call reports loans that were past due by more than 30 days. FDIC Regional Administrator Paul Worthing, who was involved in the bank's quarterly examinations, testified that the past due loan balance is an "extremely important" metric on the call report because whether "borrowers are not paying timely or not paying" is "one of the biggest functional risk areas that an institution manages."

The Bank of Oswego's past due loan balance was a source of great consternation for defendants and a frequent topic of discussion within the bank's Internal Loan Committee ("ILC"), which defendants oversaw. The MOU with the FDIC had placed specific emphasis on the bank's high-risk loans. Defendants therefore pushed hard to get past-due loans "cleaned up" to avoid reporting them on the call reports.

Heine instructed loan officers to "[d]o whatever it takes to get these things handled." Defendants zealously followed that approach. They deployed a highly irregular plan to use bank and other funds to make loan payments on behalf of delinquent borrowers, evidently without the borrowers even knowing their debts were being covered. Defendants would then treat these loans as "paid" and not include them as past due on the FDIC call reports.

At the center of this scheme was Martin Kehoe, who was also a friend and longtime associate of Walsh. Kehoe was a

"hard money lender" who gave out unsecured loans at high interest rates on a handshake basis to people who could not qualify for loans from traditional institutions. The bank's Board later discovered that Walsh was also borrowing money from Kehoe and taking money from Kehoe's line of credit at the bank for Walsh's own personal use. Ultimately, in May 2012, the bank fired Walsh for his dealings with Kehoe.

In September 2010, Yates circulated to the bank's Board for approval a loan application for Kehoe in the amount of $1.7 million. During ILC discussions, and with defendants present, "it was made known" that upon receiving the loan, some of the proceeds would then be used to pay the delinquent loans of other bank customers, specifically Howard Abrams and Edward Duffy. Walsh's notes from ILC meetings recorded "whose payments I'm going to make out of Marty's loan when it closes." The closing documents that Kehoe ultimately signed included an acknowledgment "that it was okay [for the bank] to take the payment from his credit line" to pay down the delinquent loan of another bank customer.

But the presentation Yates gave to the Board seeking approval of the $1.7 million loan concealed this purpose. The Board—which already had independent concerns about the size of the loan and had a "robust discussion" on that issue—was not told that the Kehoe loan would be used to pay the delinquent loans of other customers. Yates's presentation to the Board did not mention that point.

There was something else defendants were concealing about Kehoe too. Yates had previously approved a $675,000 wire transfer to Kehoe back in July 2010, months before presenting the $1.7 million loan application to the Board. Walsh and Yates had sent Kehoe the $675,000 just one

month after signing the MOU, even though Kehoe's existing line of credit lacked sufficient funds to cover that draw. This had caused the bank's books to go out of balance for months.

The Board first learned of the $675,00 wire transfer during the internal investigation after Walsh was fired. Defendants had not consulted the Board, conducted a proper credit investigation, or required Kehoe to sign appropriate loan paperwork before sending him the $675,000. An FBI detective who interviewed Yates testified that Yates confirmed she authorized the wire transfer. But Yates could not give investigators an explanation for why this money was sent to Kehoe. As soon as the $1.7 million loan closed, Kehoe redirected $675,000 back to the bank to balance its books—another purpose of the $1.7 million loan that was not disclosed to the Board.

On the same day that the $1.7 million loan closed, Walsh began using the remainder of the Kehoe loan proceeds to make payments directly from Kehoe's account on behalf of other delinquent bank customers, as defendants had previously agreed. Walsh started with the loan of Howard Abrams, a bank customer who consistently "struggle[d]" to make his payments and who had been discussed at ILC meetings as a good use of the Kehoe loan proceeds. On September 30, 2010, the day that Kehoe's line of credit closed—and the last business day of the third quarter of 2010—Walsh "arrange[d] for Mr. Kehoe to make a payment" for Abrams. Walsh testified that he later "ma[d]e another payment with Mr. Kehoe's money on behalf of Mr. Abrams" as well. The bank's 2010 third quarter call report failed to include Abrams's loan as past due. If it had been included, the bank would have had to add over $197,000 (the full amount of the loan) to its delinquent-loan balance for that quarter.

Walsh also used the Kehoe loan proceeds to make loan payments for Edward Duffy, who was "chronically late" and a significant source of concern for defendants. On September 30, 2010, the same day as the payment on behalf of Abrams and the last business day of the third quarter, Walsh arranged a payment on behalf of Duffy using money from Kehoe's loan.

Duffy, for his part, testified that he had deliberately stopped making loan payments to force the bank to restructure the loan. He never requested or authorized the payment made on his behalf. Walsh later told Duffy that Walsh made the payment "to keep the loan current" because of the "federal examiners." The bank's 2010 third quarter call report failed to include Duffy's loan as past due. If it had been included, the bank would have had to add over $199,974 to its delinquent-loan balance for that quarter.

Finally, Walsh used money from Kehoe's $1.7 million loan to make a loan payment on behalf of Robert Goodman, a bank customer who was "always late" on his payments following his divorce. Walsh directed a transfer of $22,784 from Kehoe's loan proceeds "to get [Goodman] off . . . the past due report" for 2010. Goodman's payment was also made on the last day of the third quarter. Yet, the bank's 2010 third quarter call report failed to include Goodman's loan as past due. If it had been included, the bank would have had to add over $995,227 to its delinquent-loan balance for that quarter.

The jury heard evidence that using funds from a loan to Kehoe to pay off the loans of other unsuspecting delinquent customers was not consistent with the FDIC's call report requirements. The Kehoe arrangement, the FDIC's Paul Worthing explained to the jury, "mask[s] the true performance issues" in the delinquent loans and "exposes the

bank to even greater levels of risk." "Essentially, they are using bank funds . . . to bring past due loans current." Those loans, Worthing testified, "should be reported as past due."

Defendants' efforts to reduce the bank's exposure on the call reports was not limited to the Kehoe arrangement. At the end of the quarter, Yates personally cleared the past-due loan of bank customer and former NBA basketball player Chris Dudley to keep his delinquent loan off the call report. Dudley held two personal accounts and a separate political campaign account at the bank. At one point, Dudley missed a payment on a personal loan, but neither of his personal accounts had sufficient funds to cover the $23,326.66 due.

A bank teller testified that Yates directed her to transfer the amount owed out of Dudley's political campaign account to cover the past-due payment. The teller refused and Yates walked away upset. A loan specialist testified that Yates gave her the same direction. The loan specialist did as she was told, annotating the transaction "per Diana." Yates did not report Dudley's delinquent loan on the next call report, which would have required adding $975,847.83 to the delinquent balance. Dudley told the jury that he "absolutely" did not approve "any transfer from a political campaign" account to "something personal," and that the bank later told him it was just a mistake.

Finally, with defendants' knowledge Walsh resolved one of the bank's delinquent loans on his own. Chris Guettler's loan was one of the "most problem[atic]" on the bank's books. Walsh testified that defendants "handed" him the Guettler loan to "fix," and that Guettler's ongoing delinquency was discussed at ILC meetings. There was "tremendous pressure" from both Heine and Yates to get Guettler's payment in.

So Walsh decided to make the payment himself, on the last business day of the fourth quarter of 2011. When he informed the defendants he had done this, Heine gave Walsh a "high-five knuckles," and Yates smiled and joked she was "not supposed to hear that." Then the group "all bought beers and cheered each other and had a couple of drinks and celebrated the year."

Walsh testified that he made the payment for Guettler "to clean up the reports." He felt "like it was the right thing to do for everybody, just to clean the report and make it go away." The jury also saw an email exchange in which the bank's controller expressed concern about Walsh's payment. Yates responded that, "[i]t looks worse than it is," and Walsh "should have . . . done [it] in cash." Yates instructed the controller to edit the transaction to "[s]omething more generic." Yates omitted Guettler's loan from the bank's past due loan balance on the next call report. Adding it would have required including another $69,704 to the delinquent loan balance.

The FDIC's Worthing also testified about Walsh's payment for Guettler. Worthing explained that under FDIC rules, if a bank employee made payments on behalf of customers to get loans "off of a report," as Walsh did for Guettler, the bank should reverse the transactions and deem the loans "not current." As Worthing explained, "the loans were not brought current in a manner that the borrower is performing on those loans. So there is additional risk in those loans and we want those to be reported accordingly on the call report . . . because they are not performing. A bank employee using their own money to disguise that performance is, in my mind, improper."

## C

The third scheme involved defendants' efforts to reduce the size of the bank's OREO portfolio by selling off two OREO properties, known as "Mesick" and "Bishop."  Both properties were problems for the bank.  Mesick was "really a mess," littered with trash, "[t]he back was overgrown," and it was infested with rodents.  Bishop had a "bunch of illegal or code infractions."  It was also the "last piece of foreclosed property" in the bank's OREO portfolio at the time it was sold.

Walsh, Heine, and Yates met with a property developer, Randall Coleman, who bought and flipped rental properties. In late March 2010, after the poor 2009 FDIC examination and just before the MOU, Coleman agreed to buy the Mesick property, which defendants could then remove from OREO. But to make the sale happen, defendants again engaged in a scheme improperly to divert bank funds, route them through a middleman (here Coleman), have those funds come back into the bank as if it were new money, and then use the cash to clear up the undesirable information on the call reports.

FDIC regulations require that any debt-financed purchase of an OREO property include a cash down-payment by the buyer.  The purpose of this rule is to mitigate the bank's risk by ensuring that the borrower has "skin in the game."  In fact, the bank's auditor specifically informed Yates that Coleman would need to put 20% down for the properties to be moved out of OREO.

Defendants initially ignored this requirement and extended a $375,000 loan to Coleman that would allow him to completely finance the Mesick purchase, without any down payment.  Yates appreciated the significance of this arrangement.  As she wrote to Walsh in an email: "So they

have no down payment whatsoever?  This is not going to be pretty."  Nevertheless, in an email to Heine and several other bank employees with a "smiley face" emoticon, Yates wrote: "Approve to move property out of ORE☺."  This would represent to the Board and FDIC that the sale was conforming.

Bishop then became the last foreclosed property in the bank's OREO portfolio.  In July 2010 (soon after signing the MOU), Yates approved financing for Coleman to purchase the Bishop property with another bank loan of $325,000. She again did not require Coleman to make a down payment. Bishop's OREO designation was then removed.

The Board was not aware that either of Coleman's loans were made without down payments.  Defendants also were not forthcoming about this with the FDIC.  On January 26, 2011, Yates emailed Heine, Walsh, and others with the subject line: "Mum's the word for now."  In the email, she explained her concern that the FDIC examiners would realize the loans were "not conforming," but that she was "not going to mention it" because otherwise the properties "will all have to go back to OREO☹."  A few weeks after that email, defendants sent a letter to the bank's external auditor, falsely representing that the bank had "received all cash down payments" for Mesick and Bishop, which are "satisfactory for the full-accrual sales treatment of these transactions."

Despite the defendants' efforts, the FDIC noticed the deficiency and objected that Coleman had not put enough of his own money down to allow the bank to remove the two properties from OREO.  Yates wrote a memo to the FDIC promising to remedy the situation.  And defendants then went back to the drawing board to formulate a new plan to try to "cure the Colemans."

But their new plan once again involved giving Coleman more of the bank's money as part of resolving weaknesses on the bank's call reports. As Yates wrote in an email to Heine and others, "We are going to have to figure out a way to give Mr. Coleman a loan. I am afraid the examiners are going to pull all of this in September to ensure all is cleared." After the bank's controller sent a series of emails to Yates asking for updates on the Coleman down payments and noting that the bank's books had been out of balance for months, Yates signed a credit approval presentation for a $100,000 loan to Coleman.

The presentation falsely represented that the loan would be used for "improvements to investment properties." The bank's Chief Credit Officer Kelly Francis testified that, in fact, the $100,000 "would be to clear up the balance position on the bank's books." Francis testified that she raised concerns about Coleman's liquidity on numerous occasions, but Yates responded, "Just get it done." Otherwise, Yates wrote, the bank would have to write off the amount: "It is either do it or charge off 100K today." Heine approved the $100,000 loan: "Amen. Approve." Once the loan went through, $90,000 of it was directed back to the bank as Coleman's "down payments." But on the next call report, Mesick and Bishop were again not disclosed as OREO properties.

Around this time, Yates emphasized to the Board the bank's "very healthy" net income for 2011, noting that she and Heine were "very proud of our full 2011 results." Defendants received $50,000 performance bonuses in early 2012.

D

All of this would eventually catch up with defendants when the FDIC undertook a further investigation, this time with the FBI. Walsh was arrested and pleaded guilty to wire fraud charges and conspiracy to make a false bank entry. He agreed to provide information to aid the government's investigation of Heine and Yates. Walsh was sentenced to 30 months in prison.

Once defendants' schemes came to light, the bank ceased operating. Its remaining assets were sold, its employees lost their jobs, and shareholders lost most of their investments.

The government indicted Heine and Yates for conspiracy to commit bank fraud, 18 U.S.C. § 1349, and numerous counts of making false bank entries, 18 U.S.C. § 1005. The indictment alleged that the purpose of the conspiracy was "to conceal the true financial condition of the Bank and to create a better financial picture of the Bank to the Board of Directors, shareholders (current and prospective), regulators and the public." "To achieve this," the indictment alleged, defendants "reported false and misleading information about the performance of loans, concealed information about the status of foreclosed properties, made unauthorized transfers of Bank proceeds, and failed to disclose material facts about loans to Bank insiders to the Board of Directors, shareholders, and regulators." Heine and Yates's principal defense at trial was that Walsh was to blame and that defendants did not appreciate what he was doing.

The jury didn't buy it. It convicted defendants on one count of conspiracy to commit bank fraud. It also convicted them of twelve counts of making false bank entries. The

court today vacates all these convictions. The court's reasoning, as I will explain, is based on legal error.[1]

## II

The majority's first move is to vacate defendants' convictions for conspiracy to commit bank fraud. But to get there, the majority must ignore the overwhelming evidence of defendants' guilt, which the government presented to the jury through a valid bank fraud theory—so valid, in fact, that the majority does not even question it. The majority then finds fault with a single PowerPoint slide that the government used at closing argument. Between that slide and the district court not giving a responsive curative instruction, the majority holds that defendants' conspiracy convictions must fall.

The court's decision presents nowhere near the basis required to undo the result of defendants' month-long trial. In holding otherwise, the majority wrests from jurors a decision that was rightfully theirs to make, while failing to show the proper deference to the district court's real-time judgment calls. In the process, the majority gives defendants—for now—a free pass for committing serious misconduct that Congress understandably decided was detrimental to our nation's banks.

---

[1] Defendants raised a variety of other issues on appeal that the majority does not reach. I address only the grounds on which the majority vacates defendants' convictions. But I note that defendants' other arguments are insubstantial. I would have rejected them in affirming defendants' convictions in full.

A

Although the majority obscures the point, it is important to understand that defendants' conspiracy convictions were based on an entirely sound theory of bank fraud, and one that the majority opinion does not counter.

Under 18 U.S.C. § 1349, it is a crime to conspire to commit bank fraud. The bank fraud statute, in turn, punishes anyone who "knowingly executes, or attempts to execute, a scheme or artifice" to "defraud a financial institution." *Id.* § 1344(1). To qualify as a "scheme to defraud," "the scheme must be one to deceive the bank *and* deprive it of something of value," meaning money or property. *Shaw v. United States*, 137 S. Ct. 462, 469 (2016); *see also Neder v. United States*, 527 U.S. 1, 20–21 (1999) (explaining that "scheme or artifice to defraud" is interpreted analogously in the wire, mail, and bank fraud statutes). The deprivation of property "must play more than some bit part in a scheme: It must be an 'object of the fraud.'" *Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)). The government's proof easily met these elements.

As an initial matter, and quite obviously, the jury could conclude that defendants engaged in a scheme to deceive the bank. The majority opinion does not suggest otherwise. Defendants repeatedly misled the bank's Board and bank employees about A Avenue and the loans to Martin Kehoe and Randall Coleman. Defendants improperly used bank funds to complete an unlawful straw purchase of A Avenue; made an unauthorized $675,000 wire transfer to Kehoe; misled the Board about the purpose of the $1.7 million Kehoe loan; misleadingly used the Kehoe loan to pay off delinquent loans of other customers without their knowledge; took money out of Dudley's political account

and improperly used it to pay off his personal loan without telling him; failed to obtain required down payments from Coleman; and misled the Board about the purpose of Coleman's later $100,000 bank loan.

This was deception upon deception. Each of defendants' wrongs was independently deceptive and subject to the bank fraud statute. *See, e.g.*, *United States v. Vinson*, 852 F.3d 333, 342–43, 344 n.13, 352 (4th Cir. 2017) (upholding bank fraud conviction when, among other conduct, defendant conspired with bank president to obtain approval of sales without conforming down payments, made unauthorized loans, and concealed the true purpose of loans he obtained); *United States v. Peterson*, 823 F.3d 1113, 1118, 1120–21 (7th Cir. 2016) (upholding bank fraud conviction when defendants falsely claimed that their loans would be used for business purposes); *United States v. Gallant*, 537 F.3d 1202, 1211, 1225 (10th Cir. 2008) (upholding bank fraud conviction when bank officials conspired with others to "conceal delinquencies" by "making [accounts] appear current without any payments by the cardholders"); *Feingold v. United States*, 49 F.3d 437, 440 (8th Cir. 1995) (upholding bank fraud conviction when bank president ensured "that the bank loan committee and its directors did not know the true purpose of the loan or the nature of the risk involved").

These individual wrongs were bad enough. But as pieces of a collective effort to deceive the bank and regulators about the financial health of the institution, they were deceptive beyond that. This is quite plainly a permissible theory of deception under the bank fraud statute. *See, e.g.*, *United States v. Molinaro*, 11 F.3d 853, 857–58 (9th Cir. 1993) (upholding conviction under § 1344 when bank owner concealed facts that would have made regulators "frown"

and that "would excite the Board's interest and invite closer scrutiny of [the bank's] solvency"); *United States v. Severson*, 569 F.3d 683, 685–86 (7th Cir. 2009) (upholding bank fraud conviction when the defendant participated with bank's president in scheme to "mask the bank's dilapidating condition and to present the illusion of a financially sound bank"); *United States v. Fields*, 614 F. App'x 101, 102 (4th Cir. 2015) (affirming convictions of bank executives when "[t]he indictment alleged that the objectives of the conspiracy were to hide the true financial condition of the Bank and to benefit the conspirators at the Bank's expense").

Defendants also deprived the bank of money or property as part of this deceptive scheme. *See Shaw*, 137 S. Ct. at 469. How? Because *they literally took from the bank millions of dollars and repurposed it.* Defendants diverted from bank funds: $267,727 to Danny Williams to do a straw purchase of A Avenue; $675,000 for Kehoe's initial unauthorized wire transfer; another $1.7 million to Kehoe to cover up the initial $675,000 outlay and surreptitiously pay off other people's loans; $23,326.66 out of Dudley's political account; and $100,000 to Coleman to pay back the down payments defendants falsely represented Coleman had already made, to say nothing of the initial amounts loaned to Coleman to finance the Bishop and Mesick purchases and get them out of OREO. All of this was money defendants took from bank funds as part of their fraudulent scheme.

Under Supreme Court precedent, it is irrelevant whether the bank suffered an "ultimate financial loss" or whether defendants had an "intent to cause financial loss." *Shaw*, 137 S. Ct. at 467. The bank had "the right to use [its] funds." *Id.* at 466. Defendants misappropriated those funds. It is hard to imagine a clearer deprivation of money or property than actually diverting millions of dollars from the bank. *See*

*id.* at 467 (explaining that it is "'sufficient' that the victim (here, the bank) be 'deprived of its right to use of the property, even if it ultimately did not suffer unreimbursed loss") (quoting *Carpenter v. United States*, 484 U.S. 19, 26–27 (1987)).

The defendants respond that, in fact, taking money from the bank was not an "object" of their scheme because it was merely an "incidental byproduct" of their broader "objective" of lying to the bank's Board and government regulators about the bank's financial health. The basis for this argument is the Supreme Court's "Bridgegate" decision in *Kelly v. United States*, 140 S. Ct. 1565 (2020). Quite fortunately, the majority does not go with defendants on this point, instead assuming that the government's "bank-funds theory" was permissible. But it should be clear that defendants' reliance on *Kelly* is wholly without merit.

In *Kelly*, the defendant public officials closed two lanes of the George Washington Bridge to punish the Fort Lee, New Jersey mayor for refusing to support the Governor's reelection. *Id.* at 1568–69. To ensure that traffic in the remaining lane would not be further delayed during the toll collector's breaks, the defendants arranged for a second toll collector to be on duty. *Id.* at 1570. The government argued that the added cost of this toll collector constituted a property deprivation sufficient to sustain a conviction for wire fraud (which has the same analytical structure as the bank fraud statute we consider here). *Id.* at 1572.

The Supreme Court rejected the government's theory. The Court explained that "the Government had to show not only that [defendants] engaged in deception, but that an object of their fraud was property." *Id.* at 1571 (quotations and alterations omitted). While "a scheme to usurp a public employee's paid time is one to take the government's

property," in *Kelly* the defendants' "use of Port Authority employees was incidental to—the mere cost of implementing—the sought-after regulation of the Bridge's toll lanes." *Id.* at 1572. This was insufficient to support defendants' convictions because the "property must play more than some bit part in a scheme." *Id.* at 1573. A "property fraud conviction cannot stand," *Kelly* held, "when the loss to the victim is only an incidental byproduct of the scheme." *Id.*

Properly considered, this case bears no meaningful resemblance to *Kelly*. Defendants' fraudulent diversion of *millions of dollars in bank funds* was not somehow a mere "bit part," "implementation cost," or "incidental byproduct" of their fraudulent scheme. Even if defendants misguidedly believed that all the bank's books would eventually balance out, using bank funds was *central* to their fraud.

*Kelly* was concerned with federal prosecutors misusing the wire fraud statute to turn "every corrupt act by state or local officials . . . [into] a federal crime." *Id.* at 1574. Defendants' misconduct at their bank, in sharp contrast, lies at the foundation of the bank fraud statute. Defendants *took the bank's money*, diverted it to trusted third parties (Williams, Kehoe, Coleman), and then used these third parties to re-route the money back to the bank to wipe away troublesome bank records that would otherwise attract the scrutiny of the bank's Board and regulators. Diverting the bank's funds was necessary, central, and critical to the entire scheme. Under any reasonable sense of the phrase—both linguistically and conceptually—depriving the bank of this money was "*an* object" of defendants' fraud. *Id.* at 1571 (emphasis added) (quotations omitted).

The Second Circuit in *United States v. Gatto*, 986 F.3d 104 (2d Cir. 2021), rejected the same argument under *Kelly*

that defendants raise here. In *Gatto*, the defendants were employees at a sports apparel company that had sponsorship agreements with university sports programs. *Id.* at 111. The defendants illicitly paid money to basketball recruits' families to entice the recruits to join these programs, which would have made the students ineligible under NCAA rules. *Id.* Defendants were prosecuted for wire fraud, and the Second Circuit upheld the convictions on the government's theory that defendants had deprived the universities of money used for financial aid given to the student athletes. *Id.* at 116.

In so holding, the Second Circuit rejected the defendants' reliance on *Kelly*. The Second Circuit explained that "[d]efendants may have had multiple objectives, but property need only be '*an* object' of their scheme, not the sole or primary goal." *Id.* (quoting *Kelly*, 140 S. Ct. at 1572) (citation omitted). Depriving the universities of funds was not merely an "implementation cost[]" or "incidental byproduct" of defendants' scheme but was rather "at the heart" of the scheme, because "the scheme depended on the Universities awarding ineligible student-athletes athletic-based aid." *Id.* That was so even though depriving the universities of financial aid monies was part of defendants' *broader scheme* to pay recruits' families to ensure that recruits went to schools where defendants' apparel company had lucrative sponsorship relationships. *See id.* at 109.

As in *Gatto*, diverting money from the bank may not have been Heine and Yates's "sole or primary goal." *Id.* But it was "at the *center* of the plan," *id.*, because the larger scheme to conceal the bank's poor financial standing integrally depended on using the bank's own funds for that purpose. This case involves a scheme broader than simply depriving the bank of money outright, just as in *Gatto* the

scheme was broader than just depriving the universities of money. But that made no difference to the Second Circuit, and it should make no difference here. Defendants in this case did not somehow remove millions of dollars from the bank "incidentally."

The central role of the monetary deprivation here in relation to the fraud is thus fundamentally different from what occurred in *Kelly*, where the deprivation of toll collectors' wages was merely a bit byproduct of the political payback scheme. That Heine and Yates taking money from the bank was part of their broader effort to mislead the bank and the FDIC should not somehow take their misconduct outside the bank fraud statute. That would create nothing less than a license to misuse bank funds.

## B

The majority does not disagree with anything I have just said about the theory of bank fraud set forth above. It is clear, in my view, that this theory was a legally valid one. And a massive amount of evidence supported it, too. So what could provide the basis for reversing defendants' conspiracy convictions?

The majority offers only this: during closing argument, the government used a PowerPoint slide that featured some misplaced theories of "something of value." But a few misstated bullet points in a PowerPoint deck cannot be a thread that somehow unravels defendants' entire multi-week trial. The misplaced PowerPoint slides were clearly harmless to the overall result. *See Skilling v. United States*, 561 U.S. 358, 414 & n.46 (2010).

At closing, the government used a 157-slide PowerPoint presentation. One slide, entitled "Something of Value,"

stated that defendants "Sought to deprive Bank and [the Board] of" (1) "Accurate financial information in Bank's books and records"; (2) "The defendants' salaries, bonuses, and use of Bank's lending services"; and (3) "Use of Bank funds."   Later, outside the presence of the jury, Heine objected that "something of value cannot be the accuracy of the information that was the subject of the representation," and sought a curative instruction.  The district court declined to give one.

The majority concludes that depriving the bank of accurate information, a more abstract deprivation, could not be a deprivation of money or property under the bank fraud statute.  I agree with that.  The majority also concludes that depriving the bank of defendants' salaries and bonuses was not the deprivation of property either.  I suspect the majority is not correct when it comes to performance-based compensation. *See United States v. Ratcliff*, 488 F.3d 639, 644 (5th Cir. 2007) ("We do not dispute the Government's contention that a salary and other financial employment benefits can constitute 'money or property' under the statute.").   But it is easy enough for me to assume for purposes of analysis that both these theories on the government's PowerPoint slide are impermissible.  Even so, this certainly does not justify reversing defendants' conspiracy convictions.

When it came to the actual jury instructions, the jury was correctly charged using language that directly tracked the bank fraud statute: "The phrase 'scheme to defraud a bank' means any deliberate plan of action or course of conduct by which someone intends to (a) deceive or cheat (b) a bank out of something of value."  The instructions did not ascribe any definition or legal theory to "something of value," as

defendants concede. Indeed, the district court pointed that out when denying Heine's request for a curative instruction.

Although the majority purports to rely on the fact that the jury instructions did not further define "something of value," defendants do not assert they requested any jury instruction on "something of value." In fact, they do not challenge on appeal any of the jury instructions that the district court gave. The jury was also correctly instructed that "arguments by the lawyers are not evidence." To say that the jury *during the trial* was given three different theories of "something of value," as the majority does, is thus not correct. At best, the jury was given three different theories on a single closing argument PowerPoint slide.

The majority acknowledges, of course, that one of these three theories of "something of value" was the defendants' "Use of Bank funds"—the perfectly legitimate theory I detailed above. But the majority somehow claims that the government "said little more about that theory at trial." That assertion blinks reality. The *entire focus* of the government's case during defendants' lengthy trial was to show—through witness after witness and document after document—how defendants diverted money from the bank, "cleaned" it through valued third parties like Kehoe, and then arranged for the money to come back into the bank where it was re-deployed to problem areas in the bank's portfolio that were likely to invite inquiry. Again, there is no challenge to the jury instructions here. And the government was not required to argue to the jury through special terminology—as opposed to demonstrate with evidentiary proof—that defendants had as an object the diversion of bank funds.

The majority is thus simply wrong in claiming that from the perspective of whether the defendants deprived the bank

of something of value, the "accurate-information" and "salary-maintenance" theories "were the focus of the entire prosecution." That defendants lied to the bank, and that they did so to preserve their own financial well-being, were certainly themes in the government's case. But these were part of the government's entirely lawful theory *of deception*.

Critically, there is no serious challenge to the admissibility of any evidence here. And the *evidence* relating to defendants misleading the bank and regulators about the financial health of the bank, as well as defendants' salaries and bonuses, was independently relevant to other aspects of the government's proof and its overall theories of fraud and motive. Defendants do not challenge the admissibility of this evidence, nor could they. The majority is thus clearly mistaken in claiming that "the entire district court proceedings were permeated with . . . prohibited . . . theories." (quotations and brackets omitted). The district court proceedings were permeated with *admissible evidence*—all of which was damning for the defendants on the various elements the government was required to prove.

The issue thus comes back to whether the government's use of a partially inaccurate "Something of Value" closing argument slide warrants reversal. It clearly does not. "Even when a contemporaneous objection is made, improprieties in counsel's arguments to the jury do not constitute reversible error unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *United States v. Mendoza*, 244 F.3d 1037, 1044–45 (9th Cir. 2001) (quotations omitted); *see also United States v. Barragan*, 871 F.3d 689, 708 n.20 (9th Cir. 2017).

Some of the factors we consider in making that determination are the strength of the prosecution's case

notwithstanding the error, *Barragan*, 871 F.3d at 708, the emphasis placed on the error in the "context of the entire trial," *United States v. Senchenko*, 133 F.3d 1153, 1156 (9th Cir. 1998), and whether the jury was properly instructed, *United States v. Medina Casteneda*, 511 F.3d 1246, 1250 (9th Cir. 2008). We have also held that "[w]hen counsel misstates the law, the misstatement is harmless error if the court properly instructs the jury on that point of law or instructs that the attorneys' statements and arguments are not evidence." *Mendoza*, 244 F.3d at 1045 (quoting *Lingar v. Bowersox*, 176 F.3d 453, 460 (8th Cir. 1999)).

All these factors support the government. The closing argument slides were the only time the parties identify the jury hearing anything about the meaning of "something of value." While the district court declined to give a curative instruction after closing argument, this is a real-time decision for which we give the district court "substantial latitude." *United States v. Rodriguez*, 971 F.3d 1005, 1016 (9th Cir. 2020); *see also United States v. Reyes*, 660 F.3d 454, 461 (9th Cir. 2011). When the jury instructions were themselves legally correct, and when the trial judge had already instructed the jury that counsel's arguments were not evidence, I certainly cannot fault the district court decision on Heine's request for a curative instruction. *See Mendoza*, 244 F.3d at 1045.

At the very least, reversal of the convictions would not be warranted given the overwhelming evidence of guilt, including the extensive testimony showing that defendants deprived the bank of something of value—millions of dollars in diverted bank funds. We should have affirmed defendants' convictions for conspiracy to commit bank fraud. In assuming the position of both juror and district court judge, the majority forgets our role and undermines

Congress's objective to punish blatant white-collar misconduct of the type we have here, which threatens the stability of our banking system.

## III

Equally mistaken is the majority's decision to vacate defendants' convictions for making false bank entries. *See* 18 U.S.C. § 1005. The jury convicted defendants on twelve counts of making false bank entries: three for the A Avenue transaction (counts 12, 18–19); four for the Coleman transactions (counts 3, 11, 16–17); and five for the third-party loan payments on behalf of Abrams, Duffy, Goodman, Dudley, and Guettler (counts 7–9, 13, 15).

Defendants did not clearly challenge on appeal their false bank entry convictions as to the A Avenue and Coleman transactions. The government pointed that out in its answering brief, and defendants did not even address it in their reply brief. So the government will understandably be surprised to learn that the majority has vacated all of the false bank entry convictions because of their connection to the now-invalid conspiracy charge, based on what appears to be a single line of argument in defendants' opening brief—a line that does not even appear in the argument section devoted to the false bank entry convictions.

Because I believe we should have affirmed defendants' conspiracy convictions outright, premising the false bank entry charges on the conspiracy convictions poses no issue for me. But the majority, which must confront the question, concludes it is unclear whether the jury would have convicted the defendants for making false bank entries in the absence of a conspiracy. I highly doubt that conclusion is correct, even on the terms of the majority opinion. The majority itself acknowledges that "Heine and Yates were

personally involved in making the reports charged as false entries." Even if the conspiracy convictions fail, the majority has not shown why this alone requires vacatur of the false bank entry convictions.

But at the very least, given the almost total lack of briefing on this question, the majority would have done well to at least ask the parties to weigh in further on this issue before vacating convictions that the government understood defendants not to even be appealing. Or we could have left this issue to the district court on remand. Instead, in one fell swoop, all of defendants' convictions get tossed, including ones that I am not even sure defendants properly appealed.

But the majority goes further. The false bank entry convictions that defendants did clearly appeal (counts 7–9, 13, 15) arise from defendants' failure to include as past-due loans on the FDIC call reports those delinquent loans that defendants paid out of third-party funds, namely, the $1.7 million loan to Kehoe (counts 7–9), Dudley's political account (count 13), and Walsh's payment on behalf of Guettler (count 15). As to counts 7–9 and 15, the majority also holds that insufficient evidence supported these convictions, even under plain error review (for count 15). This aspect of the majority's holding now bars retrial on counts 7–9 and 15. Once again, the majority's setting aside of the jury's verdict is deeply troubling and lacks a proper basis in law.

The false bank entry statute criminalizes making "any false entry in any book, report, or statement of [a federally-insured] bank, . . . with intent to injure or defraud" the bank or the FDIC. 18 U.S.C. § 1005. Under this statute, a statement on a banking entry is "false" if it is "intentionally made to represent what is not true or does not exist, with the intent either to deceive its officers or to defraud the

association." *United States v. Darby*, 289 U.S. 224, 226 (1933) (quotation omitted). The purpose of this statute is "to give assurance that upon an inspection of a bank, public officers and others would discover in its books of account a picture of its true condition." *Id.*

Consistent with that purpose, falsity may take many forms. An entry is false if it records a transaction that is itself "false and fictitious, concocted for the very purpose of distorting [a] financial statement." *United States v. Gleason*, 616 F.2d 2, 29 (2d Cir. 1979). "[M]aterial omissions" are also false statements. *United States v. Ely*, 142 F.3d 1113, 1119 (9th Cir. 1997) (noting that "[e]very circuit" agrees). Statements "capable of misleading the officers of the bank" can be false as well. *United States v. Sheehy*, 541 F.2d 123, 129 (1st Cir. 1976). And so too statements and omissions that are intended to conceal the "true picture of the bank's condition." *United States v. Luke*, 701 F.2d 1104, 1108 n.7 (4th Cir. 1983); *see also United States v. Austin*, 585 F.2d 1271, 1274 (5th Cir. 1978) (a bank entry was false when it "prevented the FDIC examiners from discerning" an overdrawn account).

In this case, to avoid further internal and regulatory scrutiny, defendants sought to reduce the amount of past-due loans on their FDIC call reports. But there were some bank customers that were delinquent. Defendants' primary solution was to loan $1.7 million to the hard money lender Kehoe, not disclose to the bank's Board the purpose of the Kehoe loan, and then use the Kehoe loan proceeds to pay off the delinquent accounts of other customers without their knowledge. Defendants would arrange for these payments at the very end of the fiscal quarter, just before call reports were due.

"When reviewing the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Koziol*, 993 F.3d 1160, 1176 (9th Cir. 2021) (emphasis added) (quotations omitted). In the majority's view, there was no "falsity" here *as a matter of law* because the call reports simply asked whether the loans had been paid, and here they were. The majority's cramped approach to the false bank entry statute is wrong. And its refusal to accept the jury's verdict shows insufficient regard for the factfinders who heard the evidence.

The FDIC call reports required loans to be included if they were "past due." The question put before the jury was what this meant. In evidence the majority nowhere acknowledges, the jury heard extensive testimony that the bank, defendants, and the FDIC *all* understood that a "past due" loan was a loan for which "*the borrowers* are not paying timely or not paying." Indeed, the government's evidence showed that the Bank of Oswego's own loan committee had a "past due list" that identified the account number, the name of the borrower, the monthly payment, and the number of days the *borrower's* payment was past due.

Not only did the jury hear about a common understanding of "past due," it learned why it mattered to the FDIC that a "past due" loan was one for which *the borrower* had not paid. The reason: delinquent loans present a significant functional risk for the bank, which is why the FDIC requires them to be reported. The FDIC's Paul Worthing explained to the jury that defendants' rerouting of the Kehoe loan proceeds "mask[s] the true performance issues" in the delinquent loans and exposes the bank to even

greater levels of risk. "Essentially," Worthing testified, defendants were "using bank funds . . . to bring past due loans current." The FDIC through the call reports is attempting to assess how good a job the bank is doing when it loans money. If a bank is effectively using *its own money* to repay delinquent loans, the bank is conveying the misimpression that its loan practices are better than they actually are.

Based on the evidence presented at trial, it is not correct to say, as the majority does, that no rational jury could find defendants guilty of making false bank entries. To the contrary, the jury could have easily concluded that defendants' failure to include loans for which they had manufactured payments was either "misleading," *Sheehy*, 541 F.2d at 129, or omitted "vital fact[s]," *Ely*, 142 F.3d at 1119, or was intended to conceal the "true picture of the bank's condition," *Luke*, 701 F.2d at 1108 n.7, or was concocted for the "very purpose of distorting [a] financial statement," *Gleason*, 616 F.2d at 29. Or all the above. All of these would satisfy the "falsity" standard under § 1005.

The majority therefore errs in believing it relevant that the FDIC's call report form "does not call for a narrative response" or "ask for the source of a payment on any of the underlying loans." The point here is not that defendants were required to make some additional notation in a template that did not allow for it, but that defendants categorically treated as not "past due" loans that *were* "past due." Or at least the jury could so conclude based on the evidence presented.

But of course, the jury had much more to go on than just the shared meaning of "past due." The majority asserts that "the loan to Kehoe was a real loan that was approved by the board of directors." That assertion is difficult to comprehend

because it ignores the plainly fraudulent features of the Kehoe loan. The jury heard evidence that Heine and Yates failed to disclose that the loan to Kehoe would be used to pay off the loans of other unsuspecting delinquent customers (much less Kehoe's own unauthorized wire transfer of $675,000).

In *United States v. Ely*, 142 F.3d 1113 (9th Cir. 1997), bank executives similarly arranged for the bank to issue new loans under the false pretense of "enabl[ing] expansion of business enterprises," when, in fact, "the real reason" for the new loans was to pay off the interest payments on existing loans. *Id.* at 1118–19. The only difference between this case and *Ely* is that there, the executives were funding personal stock purchases. *Id.* at 1116. Here, defendants were using the loan to hide their own mismanagement. The difference is irrelevant. The Board may have "approved" Kehoe's loan, but the jury could conclude that it did so under false assumptions. And while the majority proclaims that Kehoe's loan was used to return "real money" back to the bank, this was really just *the bank's* money that had been given to Kehoe after Heine and Yates defrauded their own Board as to the purpose of his $1.7 million loan.

There were, in addition, various other irregular features of the third-party loan payments that the jury could conclude raised obvious questions about their legitimacy, and thus whether the loans should have been included as "past due." This included that the delinquent account holders *were not even told the payments were made on their behalf.* The majority asserts that "the customers had no right to refuse to make timely payments on valid loans," apparently implying that these customers were required to accept Kehoe's payments on their behalf (even though the bank never told them about the payments). But nothing would require a bank

customer to accept a favor from a hard money lender, with whatever adverse consequences might follow from that. From the perspective of Duffy, Goodman, and Abrams, their loans were very much "past due."

But there is more. All of the third-party loan payments were arranged at the end of the quarter and just before call reports were due. And in the case of Walsh paying Guettler's overdue balance himself, there is extensive evidence showing that defendants knew Walsh's conduct was improper. Why else would Yates have told Walsh she was "not supposed to hear" about this? And why else would Yates have instructed the bank's controller to edit the transaction to "[s]omething more generic"? The jury could consider these highly suspicious circumstances in determining whether defendants made false bank entries.

The majority itself recognizes that Yates taking money out of Dudley's political account was unlawful under the false bank entry statute. But it is impossible to understand why the majority draws the line there and refuses to allow the jury to credit the government's evidence as to the Kehoe transactions and Walsh's personal payment on behalf of Guettler. The majority finds significant that "once Dudley found out about it, he could have demanded that [the payment from his political account] be reversed." But couldn't Abrams, Duffy, and Goodman have demanded that the Kehoe payments—that they never authorized—be reversed as well? The same is true for Guettler. At the very least, the Dudley maneuver is just further evidence of defendants' wrongful intent to rig the call reports. It is itself supportive of the jury's verdict on the other false entry counts.

Under the majority opinion, however, defendants' only unlawful conduct in all of this was taking money from

Dudley's political account.  If only Kehoe had also covered that loan or defendants had paid it themselves, everything would have been fine.  So long as the payment is made, the loan is technically not past due, and there is no false bank entry—as a matter of law.  The majority opinion is effectively allowing banks to set up their own Ponzi schemes.  The FDIC can be forgiven for asking how it is supposed to evaluate the soundness of a bank's overall loan practices when bank executives are now given wide latitude to engage in such misleading financial maneuvering.

The highly dubious nature of defendants' conduct thus takes this case far outside the majority's hypothetical of a grandmother paying her grandchild's loan.  Suffice it to say, hard money lender Martin Kehoe was nobody's grandmother.  When a grandmother pays a loan, the FDIC's concern about a bank's functional risk is not present because the loan payment is being satisfied *independent of the bank*.  Here, defendants were effectively having *the bank* pay back its own loans through Kehoe after lying to the Board about the purpose of the Kehoe loan, which itself exposed the bank to greater risk.  *See Darby*, 289 U.S. at 226.

Perhaps defendants could have argued to the jury that what they did was no different than the beneficent grandmother.  But the jury was certainly not required to accept that sanitized view of the facts.  And the issue is, unfortunately, not a fact-bound one limited to the particulars of this case.  Under today's decision, banks can misrepresent their past due loans on FDIC reports so long as they take money from the bank, route it outside the bank, and then have a loan payment made on behalf of an unsuspecting delinquent customer.  And they may do so even if they have not been forthcoming to their boards about what they are doing.

\* \* \*

I would have affirmed defendants' convictions in full. Whatever the line between poor judgment and criminal behavior, the defendants here clearly crossed it. And armed with a citation of the court's opinion, I am concerned that many more will do the same.

I respectfully dissent.